I will turn to the next case on our calendar, which is United States v. Larry Willis and Isaiah Pierce. Good morning, Your Honor. Carl, how are you? I just wanted to ask Mr. Cope how he was. We heard that he was, are you in a hospital now? Would you, would you turn off your mute? Attorney Cope, turn off. I made it home last week. Are you in a hospital? Can you hear me? That's great. It's good to see you. Thank you very much. I appreciate it. Okay. All right, but we'll start with, well, which of you is going first? I am, Your Honor. Yes, thank you. May I please proceed? Oh, thank you, Your Honor. May I please the court? Carla Sanderson for Larry Willis. First, I'd like to speak about the insufficiency of the evidence as it relates to count five, and then turn to the court's sentencing errors, and finally, whether the case should be sent back down to the district court to determine whether the state and federal sentences should run concurrently. With regard to count five, that count charged possession with intent to distribute cocaine, and it referred to the powder cocaine as opposed to the cocaine base in count two. Count five was insufficient because the government did not prove Mr. Willis knowing and intentionally possessed the powder cocaine. It helps to understand the layout of this building. This was a two-unit building with a lower apartment and an upper apartment. The cocaine and the majority of the drugs were found in the upper unit.  And the cocaine and the drugs upstairs, well, the cocaine was located in a locked bedroom upstairs. So, Mr. Willis did not have a key to either the upper unit or the locked bedroom where the cocaine was located. So, he did not even have access to the powder cocaine. And there's no evidence that he had ever been inside the upper unit. None of his belongings were up there. So, the government didn't even prove his knowledge of the cocaine in the upper unit. This is not a conspiracy count. This was a possession count, and there's no evidence of actual or constructive possession of that cocaine. And they were acquitted of conspiracy. These two defendants were. That's correct, Your Honor. And Mr. Willis was also acquitted of the other drug possession counts in the upper unit based on the very same evidence. With regard to, like, the cocaine. Do you think this was an error of the judge to attribute the cocaine powder to Mr. Willis? Yes, an error by the jury and also the judge. In the Rule 29 motion, the judge did make a statement that Mr. Willis was only convicted of the drugs located in the downstairs unit. But that's not true because Count 5. Okay, turning to. I'm sorry, Ms. Anderson. Let me try to I want to make sure I understand what your argument is. There's a separate question as to at sentencing by a preponderance of the evidence. Did the judge error in attributing the upstairs drugs to Mr. Willis? Excuse me, but your argument goes to the specific count of possession of a firearm in furtherance of possession of drugs. Right? Well, the argument I just made your honor related to Count 5, the possession with intent to distribute cocaine powder. I did make other sufficient. Oh, so I'm sorry. So I'm sorry. So so that is one particular count and you're saying that the evidence as to Mr. Willis was insufficient for that particular count. Yes, I did make additional arguments in my brief, but there were too many to squeeze in right now. I understand, but that's the one you're focused on here. And if that if that were if that argument is successful, what if any impact does that have on Mr. Willis's sentence? Unless we also conclude that the judge erred in finding by a preponderance that there actually was a conspiracy and that he was responsible for the drugs in both apartments. Well, I think your honor it would need to be sent back for the court to reassess its guidelines calculation because there was no finding on the cocaine powder because it was part of the conviction. However, your your honor does make a point that the court would have to also rule on the error with regard to joint conduct because that finding encompass the totality of the drugs. So there should be there should be a new we should remand if we accept this argument. I understand you make other arguments that would lead to other relief. But if we accepted this argument, you're saying we would need to remand for resentencing with the judge taking account of the fact that he mistakenly believed that the defendant had been properly convicted on count five. Yes, your honor. And we're also asking the court to remand and rule that the judge erred in including the totality of the drugs. Do I understand? That's a separate argument. I'm just focused on the one that you highlighted as your first argument at oral argument. If that is the one that we agreed with, that would be the relief that is required by that error. That is to send back for a remand for resentencing. Yes, your honor. Okay, got it. I'm sorry. With regard to the sentencing errors, the court erred in finding the totality of the drugs were foreseeable to Willis based on a joint conduct theory. There were no communications between Willis and Pierce introduced in evidence. There is no cooperating witness in this case to testify as to joint conduct of the two of them together. Wasn't there founded Willis's in the lower apartment? That's correct, your honor. There's no question. They knew each other, but more is required. It would be speculation. It was speculation for the court to say because they knew each other and Willis had links to the lower unit that he necessarily worked with Pierce. There was no other evidence that they work together. And the court also relied on unproven acquitted conduct evidence to hold Willis responsible for the totality of the drugs, specifically the evidence underlying counts 10 and 11 that Willis possessed drugs at the Erie County Sheriff's Office at 45 Elm Street. This was based Willis was acquitted of those two counts and this was based. This testimony was solely one government witness officer Carney who claims that he and detective Granville were at this Sheriff's Office and recovered drugs on the ground that Willis dropped and you're saying that you're saying that the judge clearly erred in believing that witness by a preponderance of the evidence. Yes, your honor. Because the jury rejected his testimony as proof beyond a reasonable doubt or because you are saying it's so inherently incredible that we should decide that the judge could not reasonably have accepted that testimony. The latter your honor and that's because that officer Carney testified that the other government witness Granville was present with him and recovered the drugs from the floor. But that detective Granville also testified at trial and he did not testify that he recovered drugs from Willis. He didn't testify that he was at the Sheriff's Office that day. He testified he was in another place entirely outside of 70 Henrietta Street surveilling the location. So we have the government witnesses testimony completely undermined by another witness. So in that unique circumstance, I think the court should have justified why it found that even proven by a preponderance. But instead the court just dropped a footnote in its opinion stating it found by the preponderance and I think it was error for the court not to explain that and I don't think it meets the preponderance standard at all. And that finding actually was the basis for the court to include the totality of the drugs and Mr. It was a very it had a very huge impact on his guidelines calculation. And so you have reserved some time for rebuttal haven't you? Yes, your honor. Thank you. We'll hear from Mr. Culp on behalf of Isaiah Pierce. Please the court Robert Culp for Isaiah Pierce. I'm also going to focus on my sufficiency argument and my argument goes to all counts. Basic in a nutshell. We argue that because there's no evidence if there's insufficient evidence of Dominion and control over the upper apartment where Mr. Pierce allegedly was conducting operations that all counts need to be thrown out because it's the best argument that the government has a time Mr. Pierce to the upper apartment is what he said to the phone on the phone to his girlfriend from prison. They got my keys. Isn't that what he said? I believe there is a reference to they've got my keys. We don't even know what keys that refers to. There's there's multiple cars in this case. There's the Equinox that that Mr. Pierce and Tansy Fuller drove to the location one time and there's key. Those are the keys that the government argued established Pierce's. And yet Tansy Fuller who had the keys because he drove he drove the car over to Henrietta Street was not it was not fingerprinted. They never took his DNA. And in fact, they never pursued him at all. That seems unusual as the government about that. I'm looking forward to you asking that question to the government because I mean the keys do not have near the significance that the government attributed to them or that the judge attributed them in the post trial motion for those very reasons. I mean, there are multiple keys on there. If these were Mr. Pierce's keys, you'd think they could find one that that operates a car that he owned or or an apartment that he was known to frequent. They didn't do that at all. They they do have what they the argument they do make was that there was a Topps key or a Topps bonus card on the key chain that was in the name of Mr. Pierce's girlfriend. But we know that Tansy Fuller's connection to this key chain is just as strong. He's the one who drove the car to the premises that day as your honor just pointed out. And also when they searched the girlfriend's house, he was hiding in the attic. So it's almost a coin toss, you know, which one of these guys belongs to these keys or or someone else entirely. The government made almost no connection other other than that argument to the keys. Is it further true, Mr. Koch, that they found no indicia of ownership in the apartment attributable to Mr. Pierce? No bills, no pictures, no clothing. Absolutely, your honor. There's there's nothing there. There are some bills and a lease found in the lower level. Those are not in Mr. Pierce's name in the upper level. You'd think if someone had dominion and control over that upper apartment, there'd be something. There's not. There's no there's no lease, no documents. There's no clothing that's identified to him. The case is much different than other cases. This course, I'm sorry. This court has decided on on this kind of circumstantial evidence of dominion and control theory. So and then there's also the DNA. I'm losing my voice a little bit. I apologize. The there was a gun located in the upper apartment that had DNA on it that was deemed highly likely to include Mr. Pierce. But it also had four other people and the government's witness admitted that DNA is easily transferred. And therefore, it doesn't even establish that he necessarily even touched that gun. And also going back, your honor, to your comments about the keys. The government didn't put before the jury who the other four people's DNA DNA were, or at least that they tested other people whose names are associated with the apartment, such as Taylor and Jones and Sharpe and some of the other people whose names you see on these documents. They didn't test the DNA or fingerprint of Fuller, Jones and Sharpe? I don't think so. I mean, if they did, it didn't come out in the government's case at trial, your honor. And so again, I apologize for my voice. The so you know how this case comes to federal court instead of state court in Monroe County. I probably prefer you ask that of the prosecutor, but I know he was initially arrested on state charges and then at some point the feds took over the case. I don't know the details behind that, but basically you've got a guy serving a 14 year sentence where you've got. I mean, the government said in their brief that he had easy access to this place. That's not true. They have evidence of one visit, December 1st, 2016 for between 20 and 30 minutes. They have no idea what happened inside. We've talked about the keys of the DNA. They've got no other evidence. This man is serving a lengthy sentence on the slimmest of evidence that I don't think satisfies this court's standards. Thank you, counsel. I will turn to the government now. Good morning, counsel. Good morning. May it please the court. Catherine Gregory, assistant U.S. attorney representing the government. I apologize, your honors. There's an alarm going off in the hallway. I have someone trying to see if it's a test or if it's real. So I apologize if I get pulled out of the building. So much for Zoom. I will do my best, but I would like to start off in case I do get pulled out. I would like to start off with clarifying a very important point on the record with respect to count five. And that is that there was cocaine recovered from the lower apartment. I can point you directly to the testimony. Detective Carney testified that he recovered, among the other items, a large Ziploc bag with powder residue. And then Caitlin... Powder residue or powder? It was a powder residue. So you can see in the photos, too, that we attached in the appendix exactly what it is. There was no powder, just the residue? Well, it's a powder residue. So as if you were to find, like, baby powder on your fingers. And again, you can look at the photos. The chemist was Caitlin Drillette. She also testified that she felt comfortable and she identified the test that she used, identifying that as cocaine powder residue. But wasn't this... There were personal use quantities downstairs. Is my recollection correct? I don't know that it was ever characterized that way at trial. Well, what was the aggregate amount that was found downstairs of the powder cocaine? The powder cocaine was the residue that was found in the cook kits that were found downstairs. So the two shoeboxes that contained hundreds of bags, hundreds of rubber bands that contained the powder, which, again, you can see in the photos attached... How much in grams was there of powder cocaine? It was a residue. So I don't believe that there were grams testified, too. So but it's your argument, Ms. Gregory. Do I have this correct? That although the quantity of powder cocaine was minimal in the downstairs apartment, the context in which it was found suggests an intent to distribute. That is, it's a big bag that has a little residue in it. And there are all of these other items that suggest the possibility of distribution. That's the argument? Essentially. And I want to stress, it's not just the big bag. It's the fact that there was two cook kits that identified, again, there were probably a dozen items in there identified during the testimony that are indicative of an operation. There's the scale, the razors with residue, the rubber gloves, the fact that there was testimony that you can't make crack cocaine without cocaine. And then, of course, there was crack cocaine or cocaine based recovered in the lower apartment as well. And to Judge Parker's question, it was about 10 grams. Counsel, can I ask you about Tansy Fuller, who drove the car to a 70 Henrietta and was never questioned? As far as I could tell, maybe he was. There was no DNA from him. Did you get fingerprints from Tansy Fuller or DNA? Your Honor, there's no evidence of that at trial. And the guilt of one person doesn't exonerate the defendants in this. And I would note that I know I understand that counsel very well. But what Isaiah Phillips suggests in his brief is that Tansy was a better candidate for investigation. He actually drove the car on which the keys were based and was found in Ms. Browse's attic when they went to talk to her. Why wasn't he ever questioned? The investigative steps aren't usually in the appellate record, and there are very good reasons for that. But at this point in the case, Your Honor, respectfully, we view the evidence in the light most favorable to the government with all inferences. I understand the standards, counsel, but I'm just asking how you hit, how you decided that it was Isaiah Pierce who had access to the upper apartment when there was no indicia of ownership, no indicia of identifying characteristics when you searched that apartment. Can you tell me why you thought it was his place? Actually, he did possess the keys. The keys were on his person, the keys that had Courtney Browse's Topps bonus card. And the testimony at trial was not that Tansy Fuller had a child with her or that Tansy Fuller was her boyfriend. The testimony was that Pierce, who had possession of those keys on his person, that Courtney Browse was his girlfriend, that Courtney Browse was the mother of his child and that Courtney Browse was who he lived with. And he had those keys. Actually, the PSR said that he had a different girlfriend right before he was arrested. Is that after Browse or was that simultaneously? I'm not sure, but I know that the evidence before the jury and the jury is free to give weight to the evidence that it that it chooses was that Courtney Browse was his girlfriend or a girlfriend. There's nothing that precludes more than one. And frankly, but the evidence that was before the jury was that it was his girlfriend, the mother of his child. There is testimony from the parole officer that he lived with her or at least, you know, lived there, among other places. And the keys were on his person. He was driving the vehicle. Tell me tell me what happened in the briefing, in the briefing room, in the police station where these men were handcuffed to the chair. Yes. So they were left alone in separate rooms. And while they were left, were they brought separately? Yes, I believe they were brought separately at the same time. Or no, I believe it was different times, but I would defer to Detective Carney's testimony. And I'll note that officers Granville and Detective Carney watched via the live video feed. They watched as he began digging down in his pants. So they thought they saw it happening. They also when they entered the room, they found a plastic bag on the floor right next to Mr. Willis covered in feces. And then it had the yellow glassy envelopes that were found in the upper apartment of the kind that were found in the upper apartment. So laboratory tests also revealed that there was heroin in those baggies, which was the same type of narcotic that was found in that upper apartment. So while they were acquitted of the conspiracy, and I think this is what your honor is getting at with respect to sentencing purposes. They were they were convicted of those possession counts also, right? Oh, they were. No, no. Mr. Willis was not convicted of possession of that. But the jury has a much higher standard of proof, which is beyond a reasonable doubt, than the district court judge has at sentencing, which again is subject to clear error. Was it clear error for the district court to make these findings? So how do you explain the bizarre circumstances that the that the envelopes with the yellow band, which were upstairs, were found in Mr. Willis's room and the envelopes with the blue band, which were found downstairs or in Mr. Pierce's room? Did they did they just make a mistake? How did that happen? No, the easy explanation and the simplest explanation is that these two men were working together in a conspiracy. Now, they were acquitted of those counts and they were also acquitted. They were acquitted of those counts because they sound so peculiar. So the problem, the problem is, Gregory, I think is that the evidence is too good. The evidence is too convenient that it links specifically the drugs recovered, according to the police testimony at the police station. Link Pierce to Willis's room and Willis to Pierce's room. And the jury evidently found that too convenient. The question is whether the question is whether the district judge was required to make the same draw the same conclusion or whether the district judge was entitled to conclude that as the government contended this somewhat odd mutual connection actually existed because police officers testified that it did and they the judge credited that testimony. Yes, that's exactly right. Your Honor. And again, the standard is clearly erroneous. Was it clearly erroneous for the district court at sentencing as a in its factual finding role to find by preponderance of the evidence? Ms. Gregory does do those coincidences don't don't they sound odd to you? No, they don't not when the government's theory in our case at trial was that these men were working together in a drug trafficking and so was what had the searches taken place simultaneously or before these two defendants were put in holding cells, holding rooms, which were the searches going on with the searches of the upper and lower apartments. Did they take place before these defendants were put in the rooms or simultaneously? I believe that the that because the officers obtained a search warrant, I believe for the upper units that took place either during or after. But I would I would I don't want to say the wrong thing. So I would defer. I believe the detectives testified as to the exact timing and the exact dates and I would defer to their testimony as to how they laid out that chronology. Weren't both of these men searched when they were arrested? They were they were but as I know how how large were these bags? Well, since one of them was coated in feces, I can only infer that it was. I don't infer how do you know how large they were? Have you ever seen the bags? A glassine? Yes, and you can see the glassines in the photos we've attached to the government appendix. So how big are they? About the size. I mean, depending on the kind of glassine envelope, I'm holding up my fingers, but that's not very helpful. But the government appendix does have photos of the of the exact bags that were found in both units. So you can see for yourself the size. I don't believe that there were. And how many were found on the floor in the in the interrogation room? I'm just I don't recall off the top of my head six six glassine envelopes and they're they're like a wax paper. So they're very thin. If you think about wax paper, six of these tiny little envelopes. So six in each room? No, six in Mr. Willis's room. And what about Mr. Pierce's room? Mr. Pierce's room, they found a plastic bag with narcotics. And then I don't believe this, at least I don't have off the top of my head the amount of glassines that they found. But I do know that's at page 229 to 30 of document 198 on the district court docket. So so is the government's theory is that these that these guys secreted them in their rectums? Is that the government's theory? Yes, as both men were searched and the rooms were searched and the fact that the bags were found with feces on them, then that's the natural inference that I and that we made at trial, which is not. Is that they dropped these drugs on the floor and they thought that no one would attribute it to them? Well, they were acquitted of the conduct at trial. So I guess I you know, I don't want to I don't want to delve too far down this rabbit hole, except to say that the district courts found by preponderance of the evidence. And I would emphasize again and again that this court, especially in Vaughn and subsequent cases, has held that relevant conduct, even if if these if these envelopes were secreted in their rectums, why in the world would they take them out of their rectums and throw them on the floor in the police department? What's what's what would the government what does government want us to believe along these lines, ma'am? Well, your honor, in anecdotally, since again, there wasn't testimony about this particular thing. But anecdotally, I can tell you that there is a fear that the bags could rupture and then you would be potentially overdosing. There's a fear that when you go to the actual county jail facility, you have to squat and cough and you're going to get caught with them anyway. And that the, you know, fastest and easiest way to disclaim something that you are storing in your rectum is to get rid of it on your terms. And in this case, the district court found that in the police station. Well, your honor, again, as opposed to being caught with it actually on your person, quite literally at the county jail facility, you know, from the time that they're arrested, when they're actually in police presence to the time when they think they are alone and unmonitored, you know, officers Granville and Carney were viewing this on a live video feed. So, Ms. Gregory, can I ask you a little more about what actually happened at the sentencing? The district judge says, I find the possession by a preponderance of the evidence, right? Yes, I believe so. Does the district judge do any of the analysis that we've been talking about today as to why the officer's testimony on this regard should be considered credible? I would have to refer to the decision itself. But the written decision does go through Mr. Willis' objections to the PSR. It does go through what the district court considered and why. So what did the district court find? How did the district court get to its preponderance conclusion? The district court reviewed the fact that Mr. Willis and Mr. Pierce both had on their person and apparently dug down their pants to get rid of it at the police station. Right. So the court essentially credits the testimony, but does not specifically analyze why that testimony is credible. That's my recollection anyway. We can check it. But the next question I would ask is, did anyone make these arguments to the district judge? Or were they made at trial? I mean, I'm guessing that the defense counsel made at trial the argument to the jury that we've been working through and that's why the jury found them not guilty. But am I wrong about that? I don't think in such graphic terms was the government's point made. But yes, the defense counsel at trial did argue that it was suspect or that it was, as your Honor's putting it... It's basically too convenient. Yes. But the district court was not persuaded by that evidently. And the district court did have a much lower standard than the jury did. Right. Got it. Okay. Thank you. No, I just would like to note that with respect to the Rahif argument very quickly that we believe that the decisions in Miller and Bald foreclosed those Rahif arguments. Well, I don't think so at all, but let's... I have two questions. One about that. Assume that we are not persuaded. Do you agree that the remedy would be to simply reverse and enter judgment of acquittal rather than to have a new trial? Since if we think that the evidence was insufficient, the evidence was insufficient and that's the end of the story? Or do you think that the same sort of argument that as far as plain error would support giving a new trial in which the government could make, if it chose, make whatever arguments it might have and present additional evidence? Under the plain error standard, which is how we're reviewing it here, prong four, I would argue just as in Miller, that this doesn't affect the integrity of proceedings because both Willis and Pierce served at least one year and I believe Willis served more than one year. Where is that in the record? Because I didn't find that. I thought that in this case the Willis at least served time served which was about six months on his prior conviction. Willis, that would be at the PSR paragraph 51 and Pierce, that would be PSR paragraph 65. They both stipulated having been convicted of felonies, didn't they? Correct, yes. Right, but did they stipulate to having served more than a year or to knowing that they had been convicted of a crime that led to, that could have led to more than a year of incarceration? They did not, but this court held in Miller that you're not confined to the trial record when you make this review and based on the PSR, you can see that they did spend at least one year and I believe more than one year for both of them incarcerated. So it wouldn't affect integrity of proceedings. Before you sit down, please speak briefly to the issue of the concurrent sentence. Yes, it's my understanding that because Mr. Willis was out on bail in the state case, when he committed the federal offense, for the Bureau of Prisons purposes, he was in primary federal custody as soon as he was arrested on the federal matter. So the federal sentence is primary and begins on the date it's imposed, which means there would be no reason for the district court to make the concurrent versus consecutive distinction even though he is in state custody. So he's already getting what is effectively a concurrent sentence and that's my understanding. So is that, I thought, I have to go back and look at it. There was some confusion on the record. Are you telling us that it's pellucid? Well, I think defense counsel, trial counsel said, mentioned in an offhand remark that his state sentence is running concurrent and no one said anything after that. No one objected. No one said, wait, what's happening? But it's the government's position that these are concurrent sentences and the record establishes that. Is that right? The record is silent, but it's our position that they're concurrent. Would the government have any objection to a technical remand? Assuming that you won on everything else, would the government have any objection to a technical remand to have the judgment modified to make clear that it's concurrent so we're not back here at some later point with some 2241 application years down the road as to when Mr. Willis is going to be released? Yes, Judge Lynch, assuming we won. Assuming we won on everything else for that limited purpose. Well, if you don't win on everything else, then we can probably throw in that element. Yes, and I'm so sorry. I'm seeing now that the fire alarm is real and I'm being suggested to vacate my office. But I will just finish. Yes, for that limited purpose, just to clarify the concurrent versus consecutive. Yes, that would be fine for a very limited purpose. Well, I hope you don't have to leave because we have rebuttal. First from Ms. Sanderson. Do you have a minute? Thank you, Your Honor. I think Ms. Gregory, if the building is burning down, really ought to leave. And I apologize. I can hear sirens, so I really think that I should go. I apologize very much to the court. I just think that I should vacate. I'm being told not to leave. And we can hear these people on rebuttal, and you'll be able to review the transcript. And if there's something they say that is horribly outrageous, maybe you can send us a letter. Okay. And go save your skin, Ms. Gregory. Thank you. Ms. Sanderson. Thank you, Your Honor. With regard to count five briefly, there were 10.35 grams of cocaine base found in the lower unit. And the government repeatedly specified that count five related to powder cocaine in the upper unit. And it looks like they're trying to change their theory at this point. With regard to the drugs at 45 Elm Street, they had Mr. Willis's DNA. There was no DNA evidence to match him to these drugs. And the government relied on Detective Granville's testimony throughout the case that he was at 70 Henrietta surveilling all day. Now the government's relying on Carney's testimony that he and Granville at the same time were recovering drugs at the precinct. The timing doesn't work out. What's your theory? What's your theory, counsel? Do you think that they were planted, these bags? I don't think that they were. I don't think they were found on Willis at the precinct. I don't think Carney was being credible and truthful in his testimony. In addition, the government stated the heroin was the same in the drugs they purportedly found as the heroin upstairs. Heroin upstairs was all mixtures. Heroin and fentanyl. Heroin and butrafentanil. The heroin purportedly found at the sheriff's office was pure heroin, according to the lab technicians. The judge never explained this discrepancy and how these different drugs would have tied Willis to the upstairs unit. Was this discrepancy raised? I don't think so, Your Honor. It was in the evidence. I don't think anyone noticed it. And that's unfortunate. It's unfortunate for Mr. Willis that nobody noticed it. But I think there's a lot of errors committed in the sentencing, particularly, that need to be fixed here. And with regard to the concurrent versus consecutive issue, Mr. Willis was in primary state custody and written over on... I think, Ms. Anderson, the government has conceded that it is a concurrent sentence and that they have no objection to having it sent back, to have it specified that it's a concurrent sentence, whether or not they win on everything else. Because if they don't win on everything else, it's going back anyway for other purposes. So they've stipulated, as far as I'm concerned. Okay. Thank you, Your Honor. Ms. Anderson. Mr. Culp, in rebuttal, I think you have two minutes. I think it's just one, Your Honor, and hopefully that's all. Okay. All right. Talk fast. Going back to the keys, I noticed that the government kept referring to them as Mr. Pierce's keys. Obviously, we dispute that. But I just wanted to point out one additional subtle fact, I suppose. When he and Tansy Fuller came to the house, to 70 Henrietta that day, there's no evidence from the surveilling officer that there was an exchange of keys. So in other words, it was Tansy Fuller who was driving the car at that time. And he's obviously the one who opened the door to the premises, which I think strengthens the lack of an inference of dominion and control as it goes through those keys. I'm sorry. Is the government incorrect when it says that the keys were found on Mr. Pierce? Yes. What happened, Your Honor, is that after the 20 or 30 minutes at 70 Henrietta, when Pierce and Tansy Fuller left, yes, Pierce was driving. So in other words, Fuller drove to 70 Henrietta. Pierce drove away. Away from. And so if the keys were on Mr. Fuller on the way in, they wound up in the possession of Mr. Pierce on the way out. Yeah. Listen, if I was representing Tansy Fuller, I'd be making the exact argument I'm making here. Exactly, yeah. It's a coin flip is your point. Right. Exactly. Thank you. And I noticed that the court was very interested in the envelopes at the police station, even though it doesn't really, it's not really important to the argument I'm trying to stress here. But I thought of something while I was watching is that how did these men, if they were hiding these envelopes in their anuses, how did they do that? They were under arrest. They were in a cop car. They were on TV. They were being watched the whole time. And I'm very hopeful that you won't even reach my new trial argument. But if by chance you don't accept the sufficiency argument, I hope you'll pay attention to that. I'm not going to make any substantive comment now. And other than that, I thank the court for its courtesy and understanding. Thank you. Thank you both. Thank you both. Thank you both. Thank you. That will conclude this argument.